**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **CRIMINAL ACTION NO.** |
| | **1:19-CR-389-LMM-CCB-15** |
| **v.** | |
| **JOAQUIN FLORES, JR.,** | |
| **Defendant.** | |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendant Joaquin Flores, Jr. is charged with conspiring to distribute methamphetamine and possessing with the intent to distribute methamphetamine. (Doc. 231). The matter is now before the Court for consideration of various motions (and perfected motions) that he filed, including for a bill of particulars, (Doc. 599), to suppress evidence from the search of his home, (Docs. 600, 701), to suppress evidence seized from a phone taken during the search of his home, (Docs. 602, 704), to suppress evidence from a tracking device, (Docs. 603, 703), and to suppress evidence from pole-camera surveillance, (Docs. 623, 702). The Government has filed an omnibus response, (Doc. 716), and Defendant has filed a reply, (Doc. 728). For the reasons set forth below, the motion

for a bill of particulars is **DENIED**, and I recommend that the motions to suppress be **DENIED**.

## I.    Roadmap

Defendant's motion to suppress evidence seized from the search of his home relates to consent that he allegedly provided during a conversation with agents on the day he was arrested. Defendant argues that he did not consent, that he was not provided with *Miranda* warnings, and that his statements were involuntary, all rendering the consent (if given) invalid. For this motion, the Court recounts below in some detail the testimony from an evidentiary hearing about the conversation Defendant had with law enforcement agents. The motion to suppress evidence seized from a phone is related, in that the phone was seized from the house, but it was subsequently searched pursuant to a warrant, which Defendant argues was not supported by probable cause. The motion to suppress evidence obtained from a pole camera involves testimony from the same evidentiary hearing, which the Court also summarizes below. Finally, the motion to suppress evidence from a vehicle tracking device is based entirely on the notion that there was not probable cause to support a corresponding search warrant, and the motion for a bill of particulars is based solely on the contents of the indictment. The facts below, then, relate primarily to the conversation in which Defendant allegedly provided

consent to search his home and phone and to the testimony elicited about the pole camera. The facts related to the other motions (for example, the details of the various warrants at issue) are addressed solely in the analysis portion of the R&R specific to those motions.

## II.   Facts

### A.   Agent Busby's Version of What Happened

In August of 2020, Danae Busby was a special agent with the Drug Enforcement Administration (she now works with the United States Fish and Wildlife Service). (Doc. 672 at 46–47).[1] She participated in a pre-dawn operation on August 13, 2020, when agents executed an arrest warrant for Defendant Flores at his home in Douglasville, Georgia. *Id.* at 47–48. The United States Marshals Service participated in the arrest as well, and deputies with that agency involuntarily opened the door and conducted a security sweep of the house. *Id.* at 48–49. The deputies encountered four men inside the house, including Defendant. *Id.* at 50. Agent Busby was not part of the team that made entry into the house — rather, she was standing by outside with Task Force Officer Jose Cadena waiting to speak with Defendant. *Id.*

---

[1] All citations are to the ECF-generated page numbers.

One of the deputies brought Defendant, in handcuffs, out to Busby and Cadena. *Id.* Defendant was placed into the front passenger seat of the agent's vehicle, and she read him his *Miranda* warnings from a card that lists the warnings otherwise contained on a DEA 13A form (in other words, the form lists the warnings, those warnings are reproduced onto a card, and the agent read from the card). *Id.* at 50–52, 75. Agent Busby did not present Defendant with an actual DEA form 13A—which has a space for an interviewee to sign, acknowledging that he understands his *Miranda* warnings—and, as such, there is no written confirmation of the warnings or Defendant's understanding of those warnings. *Id.* at 75. Nor was the conversation recorded. *Id.* at 73. But Agent Busby testified that Defendant said that he understood his rights and that he was willing to answer questions— although she could not recall his exact words verbatim. *Id.* at 52, 76. Defendant did not indicate that he had any trouble understanding, it did not appear that he was injured or in distress, and he did not offer any complaints. *Id.* at 51. Defendant remained "pretty calm" throughout the entire conversation. *Id.* at 53.

Agent Busby does not remember exactly how she began the conversation after Defendant waived his rights, nor does she recall whether she discussed anything related to his potential prosecution. *Id.* at 52–53. She does remember,

4

however, that she did not promise him anything or threaten him,[2] and that she showed him photographs and a video of other targets in the investigation (although she does not remember what type of device she used to show him the electronic images). *Id.* at 53–54, 78.

About five minutes into the interview (which lasted about 20–30 minutes altogether), one of the deputy marshals asked Busby to ask Defendant if he would consent to a search of his house. *Id.* at 54–55, 79. She asked Defendant if he had any bombs or firearms in the house, he said no, she then asked if agents could search it, and he said yes (although she does not recall the exact wording of his response). *Id.* at 54–55, 80. She did not threaten him or offer any benefit in exchange for consent (or tell him that he was not required to consent to the search), and she communicated his consent to one of the deputy marshals. *Id.* at 55, 79.

The interview continued, and some time later during the conversation another law enforcement officer approached the agent with a phone that was found on top of a nightstand in a bedroom of the house. *Id.* at 56, 81–82. She

---

[2] There were several questions asked about whether Agent Busby told Defendant that he had to tell the truth. She testified that at one point in the discussion, she showed Defendant a surveillance photo of himself, but he indicated that he did not recognize the person. (Doc. 672 at 86). In response, she told him that he should be honest and tell the truth. *Id.* at 86–87.

testified that although she does not know exactly when the phone was taken from the house, it would have been after Defendant gave consent to search. *Id.* at 83–84. Agent Busby asked Defendant if the phone was his, and he said yes. *Id.* at 56–57. She then asked for consent to search it, and Defendant gave her consent, along with the passcode. *Id.* She did not search the phone, and she is not aware of anyone else searching the phone pursuant to that consent (agents later obtained a search warrant for the phone—and she is not aware of anyone searching it prior to obtaining the warrant). *Id.* at 57–58. Agent Busby was armed during the interview, although she never drew or brandished her weapon (nor did she see anyone else do so). *Id.* at 58.

### B.   Task Force Officer Cadena's Version of What Happened

Officer Cadena testified that when Agent Busby read the *Miranda* warnings, she and Defendant were seated inside the van, and Cadena was standing outside the van. (Doc. 676 at 20, 28). The door to the van was open, and Cadena heard Busby read the *Miranda* warnings from a card. *Id.* Cadena does not remember Defendant's precise words, but he testified that Defendant agreed to speak with agents after being advised of his rights. *Id.* at 21, 28–29.

Officer Cadena testified that he remembered Defendant consenting to the search of the house, but does not remember the circumstances surrounding that

consent. *Id.* at 21–22. In response to questions from the Court, Officer Cadena testified that he heard Defendant consent to a search of the house, but does not remember the specific words Defendant used. *Id.* at 29–30. He testified that he does not remember seeing a phone, that there was discussion about a phone, and that he does not remember anything about the discussion of the phone. *Id.* at 31–32.

### C.   Rafael Colin's Version of What Happened

Rafael Colin lived with Defendant and was at the house at the time of the arrest. (Doc. 672 at 142). He testified that seven to eight people entered the house with guns drawn. *Id.* at 143–44. Colin was taken outside in handcuffs. *Id.* at 144. He saw the agents take Defendant to the van, and he testified that he did not hear them advise Defendant of any of his rights or ask for consent to search while they were passing Colin on the lawn. *Id.* at 145. He also testified that he was not in the van during the agents' conversation with Defendant. *Id.* at 147. Defense counsel asked Colin if there was ever a time after agents originally made entry into the house when all the agents left and other agents then re-entered. *Id.* at 145–46. He seemed to suggest that agents were continually in the house — but he also said that he could not always see the house from where he was outside. *Id.* at 146.

### D.    Defendant's Version of What Happened

Defendant testified that Rafael Colin woke him up by knocking on his door and saying that the police were there. (Doc. 676 at 11). Defendant walked to the living room, where armed officers pointed guns at him, and they pulled him outside and placed him in handcuffs. *Id.* at 12. At that time, Defendant's mother was still inside the house. *Id.* at 13. Agents then put Defendant into the passenger side of a van that was parked in front of the house, where he remained handcuffed (Defendant says that the cuffs were in front of him, as opposed to behind his back). *Id.* at 14. Defendant repeatedly asked the agents what was going on, and she (this is presumably a reference to Agent Busby) showed him pictures and asked if he recognized the people in those photos. *Id.*

Defendant testified that he was never told that he had the right to an attorney, that he had the right to remain silent, or that his statements could be used against him. *Id.* at 14–15. Agents never asked him if they could search his home, and they never asked for permission to search his phone. *Id.* at 15–16. Instead, as to the phone, Defendant testified that at some point an officer approached the passenger side of the van and said "do you have the code? I said yeah. He never asked. He just told me, you have the code. I gave it to him." *Id.* at 16. At some point

Defendant needed to use the restroom, and agents took him inside. *Id.* All told, Defendant said that the interview lasted about 10 to 15 minutes. *Id.* at 17.

### E.   The Pole Camera at 6529 South Norcross Tucker Road

The DEA installed a pole camera at 6529 South Norcross Tucker Road in the spring of 2019, which was active for 44 days. (Doc. 672 at 90, 96).[3]  The camera was located inside of a gray box, and the box was attached to a power pole inside of an apartment complex. *Id.* at 106, 109. The camera had the capacity to zoom in or out, and at the most zoomed-out setting, it showed several apartment buildings and an adjoining parking lot. (Doc. 672 at 92–93; Gov. Exh. 1). At the most zoomed-in setting, the camera could focus on, for example, a breezeway in one of the buildings. (Doc. 672 at 95; Gov. Exh. 5). And at all of the settings in between, the camera could focus on, for example, specific cars in the parking lot or people moving about outside of the buildings. (Doc. 672 at 93–95; Gov. Exhs. 2–4).

The camera ran continuously for the time it was operational. (Doc. 672 at 110). An agent watching live feed (which they could do from a computer or phone)

---

[3] There is also testimony in the record about a pole camera at 3544 Old Chamblee Tucker Road. (Doc. 672 at 91). The Government subsequently represented that it does not intend to use any footage from that camera at trial, and Defendant agreed that the portion of his motion challenging that camera is moot. (Doc. 676 at 7–8).

could zoom in and out or pan left, right, up, and down. *Id.* at 96–97, 112, 116. And the camera recorded what it saw. *Id.* at 97. But agents could not go back and zoom or pan from the recording. They could manipulate only the "live" view from the camera—which is what the camera recorded. *Id.* at 97–98, 117–18.

The camera did not give the agents the ability to see anything that they could not see in person—it did not have, for example, infrared or night-vision capabilities. *Id.* at 98. Nor did the camera record audio. *Id.* at 98–99. It could not see into any private residences, and it allowed agents to observe only the common, outside areas of the apartment complex. *Id.* at 98. However, if a resident in one of the apartments within the camera's view left the window blinds open, and light conditions were such that someone walking by that apartment could see inside, the camera would have the same view as that person. *Id.* at 128–29, 132–33. Regardless, the testifying agent was not aware of anyone ever manipulating the camera so as to see into any apartment, nor was he aware of any recorded footage that allowed them to see inside of a residence. *Id.* at 133–34.[4]

The DEA case agent testified that agents used the camera because there was a drug stash-house in the apartment complex. *Id.* at 113. He talked about how they

---

[4] In any event, the apartment used as the drug stash-house was not visible from where the camera was positioned. (Doc. 672 at 135).

10

would decide when to watch the camera live, and it usually depended on whether they had information that a drug transaction was likely to occur (for example, a conversation from a wiretap discussing an upcoming sale). *Id.* 113–14. He agreed that the camera allowed agents to observe the area more quickly than if they had to drive to the complex to conduct in-person surveillance, *id.* at 114–15, and it permitted them to go back and look at the recording if they learned about a deal after it occurred, *id.* at 117. Further, he acknowledged that he does not typically assign an agent to monitor and video an area 24 hours a day in person and that the camera allows him to achieve that result without the drain on human resources. *Id.* at 123–25, 130–31.

### III.   Defendant's Motions to Suppress Statements and Evidence from the Search of his Home

Defendant moves to suppress the statements that he made to Agent Busby and evidence seized from the search of his home. (Docs. 600, 701). He argues that: (1) he was never given *Miranda* warnings, (2) even if he was, his statements were not voluntary, (3) he never gave consent to search his home, (4) even if he did, the consent was not voluntary, and (5) he never consented to the search of his phone. (Doc. 701 at 11–20). The Government has filed a response, arguing that Defendant was given *Miranda* warnings and that his statements (and consents) were

voluntary. (Doc. 716 at 11–16). Defendant filed a reply, (Doc. 728), and the matter is now ripe for review.

### A.    Defendant's Statements

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). The Government bears the burden of demonstrating that a defendant has waived his *Miranda* rights "only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010) ("The Government must prove by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights."). "A preponderance of the evidence is evidence which is more convincing than the

12

evidence offered in opposition to it." *United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (*en banc*) (internal quotation marks omitted) (further noting that a preponderance is "proof that persuades the trier of fact that a proposition is more likely true than not true" (internal quotation marks omitted)).

Neither of the parties argue about the "custodial" or "interrogation" portions of the inquiry—the only question is whether Agent Busby actually informed Defendant of his *Miranda* rights. She says that she did, and he says that she did not. Whether Defendant was read his rights, therefore, is a pure credibility question.

The Court finds Agent Busby and Officer Cadena's testimony, that Busby read Defendant his Miranda warnings, credible. Agent Busby testified about the specific facts and circumstances surrounding exactly how she informed Defendant of his rights. She testified, for example, that she and Officer Cadena first asked Defendant if he spoke English, an inquiry about which he seemed offended. (Doc. 672 at 51). She then described how she read the *Miranda* warnings from a preprinted card reproduced from a DEA 13A form. *Id.* at 52, 75. And she was not describing what she normally or routinely does when interviewing someone—she testified that she specifically remembers reading the warnings on the card to Defendant in this particular interview. *Id.* at 75–76. Although she could not recite

13

verbatim the exact words Defendant used, Agent Busby testified that she asked Defendant if he understood his rights, and he agreed to answer questions. *Id.* at 76.

Officer Cadena remembers things in a similar fashion. He too testified that Defendant seemed offended when asked if he spoke English. (Doc. 676 at 20). Officer Cadena said that Agent Busby read *Miranda* warnings from a card: "She had her Miranda card and she proceeded to read the Miranda warning to Mr. Flores from her card." *Id.* Cadena testified that Defendant did not give any indication that he did not understand his rights, and he agreed to speak with the agents. *Id.* at 20–21.

The fact that both of the agents have specific recollections and remember the *Miranda* portion of the conversation consistently is persuasive. Moreover, it is at least worth noting that Busby testified several weeks before Cadena did, and Cadena confirmed that he did not speak to Busby about the case prior to her testimony, nor did he talk to her about his own testimony. *Id.* at 27. Defendant points out that there are things that Agent Busby could not remember. (Doc. 701 at 11–12). For example, she could not remember exactly how many law enforcement officers or vehicles were on the scene, (Doc. 672 at 63), whether Defendant's mother was present inside the house, *id.* at 66–67, or whether

14

Defendant ever asked to use the restroom, *id.* at 74. In contrast, Defendant argues, he remembers the specific details of the day with great clarity. (Doc. 701 at 12).

The fact that the agent does not remember if Defendant's mother was there (the agent testified that she never went into the house) or if Defendant took a restroom break is not entirely unsurprising. It is understandable that those kind of details might not have registered at the time as being particularly important and that, as such, the agent might not remember them today. She and Officer Cadena remember the more crucial facts about Defendant's *Miranda* warnings, and the Court does not discount their testimony because of the less important details that have faded from their memory.

Two points are worth nothing, however. First, Agent Busby's decision not to use a written *Miranda* waiver was a poor one. In this day and age, it is hard to imagine a good reason not to use a written *Miranda* waiver form (particularly at an operation like this one, which was planned in advance), and the agent did not provide such a reason at the hearing. To be sure, a written form is *not* required. *See, e.g., United States v. Lewis*, No. 1:18-CR-369-WMR-JFK, 2019 WL 7503156, at *14 (N.D. Ga. Oct. 1, 2019) ("A written waiver of rights form is not required to establish that a defendant knowingly, intelligently and voluntarily waived his *Miranda* rights."), *adopted by* 2019 WL 6907509 (N.D. Ga. Dec. 19, 2019). But it is "strong

15

evidence that the defendant waived his rights." *Bernal-Benitez*, 594 F.3d at 1319. And it would be especially so in a case like this, where the officer did not otherwise record the interview.

Nor is using a written form particularly burdensome on an officer (again, especially in the context of a preplanned interview—the analysis might be different, for example, in the context of a spontaneous traffic stop). This case was made harder by the agent's decision not to use a waiver form. Nevertheless, her testimony is credible and consistent with that of Officer Cadena, and I find that Defendant was properly advised of his *Miranda* rights and nevertheless elected to speak with the agent.

Second, the fact that I find Agent Busby and Officer Cadena credible necessarily means that I find Defendant's testimony—that he was not advised of his *Miranda* rights—not credible. This finding is not based on any particular nuances or impressions that I gleaned from observing Defendant at the hearing— there is nothing from his demeanor on the witness stand that counts for or against him in my credibility analysis. The three witnesses simply told their stories, without any obvious behavioral oddities or peculiarities on the stand.[5] *See, e.g.,*

---

[5] Mr. Colin's testimony does not move the needle much in either direction. He was not present in the van where the agents spoke with Defendant. (Doc. 672

*United States v. Perry*, No. 1:16-CR-334-MHC-LTW, 2017 WL 9473406, at *2 n.2, *6 n.15 (N.D. Ga. Aug. 4, 2017) (observing that a defendant, who the court ultimately found not credible, was hunched over on the stand, rocked back and forth, and refused to make eye contact with his attorney or the AUSA), *adopted by* 2017 WL 4031469 (N.D. Ga. Sept. 13, 2017).

As such, the credibility decision here is driven largely by the fact that Cadena and Busby gave similar accounts of what happened and, at the end of the day, have less of an interest in the ultimate resolution of this suppression question than does Defendant. *See United States v. Barton*, No. 8:14-cr-496-T-17AEP, 2016 WL 11469177, at *4 (M.D. Fla. Mar. 3, 2016) (noting that a defendant's credibility was subject to question in light of what he had to gain from a favorable resolution of the matter), *adopted by* 2016 WL 4689043 (M.D. Fla. Sept. 7, 2016).[6] Indeed, Agent Busby is no longer employed as a DEA agent, which tends to make her even more disinterested than might be a typical officer or agent. The Government's burden is

_____

at 147).

[6] The Court recognizes the Eleventh Circuit's admonition against making credibility determinations "solely on the 'status' of the witnesses," *United States v. Ramirez-Chilel*, 289 F.3d 744, 749–50 (11th Cir. 2002), and I have not done that here. Indeed, the Circuit has sanctioned the consideration of the "interests of the witnesses" in making credibility determinations in criminal cases, *see id.*, and I have considered those interests as one of several factors discussed above.

only by a preponderance of the evidence (and here that burden really matters—as I hope the discussion above makes clear, the credibility determination is not overwhelming in any one direction), and I find that it has been met. Defendant was given *Miranda* warnings, he waived his rights, and he agreed to speak with the law enforcement officials.

Defendant argues that his statements were not voluntary because he was awoken by armed agents, laid on the ground, and put in handcuffs, all while he was confused and concerned about his mother. (Doc. 701 at 13–14). He further argues that Agent Busby "possibly" told him that he needed to talk and needed to tell the truth. *Id.* at 14. The Government notes that Defendant did not show signs of pain or discomfort, the agents did not draw their weapons during the interview, he was not promised anything or threatened, and the agent's statements about telling the truth were general and did not undercut the voluntary nature of the discussion. (Doc. 716 at 11–12).[7]

Even though the Court has determined that there was no *Miranda* violation, it "still must determine that any confessions or incriminatory statements made by

---

[7] The Court does not agree with Defendant's reply argument that the Government failed to address voluntariness. (Doc. 728 at 2). Indeed, the Government expressly responds to Defendant's argument about Agent Busby's "statement about honesty." (Doc. 716 at 12).

a defendant were voluntary" before those statements can be admitted at trial. *United States v. Lazarus*, 552 F. App'x 892, 895 (11th Cir. 2014). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted).

Here the factors weigh in favor of finding that Defendant's statements were voluntary. The length of the interview was short—Agent Busby testified that it

19

lasted 20–30 minutes, and Defendant said 10–15. (Doc. 672 at 79; Doc. 676 at 17). There is no evidence to suggest that the agents used any physical force against Defendant, and Agent Busby testified that she did not make any threats or promises. (Doc. 672 at 53). The agent, although armed, never brandished her gun during the interview, nor did any of the other officers. *Id.* at 58. Defendant was calm throughout the entire conversation. *Id.* at 53. With those facts, the Court simply cannot find that Defendant's statements were involuntary. Although Defendant argues that the interview occurred early in the morning, following a forceful entry into the house, and that he was handcuffed, those facts are less coercive than (or at least on par with) others that the Eleventh Circuit has found to result in a voluntary statement. *See, e.g., United States v. Vanbrackle*, 397 F. App'x 557, 562–63 (11th Cir. 2010) (finding statements voluntary even though approximately eight law enforcement officers made entry into the defendant's house, some with guns drawn, but holstered their guns during the interview and did not make threats or promises); *United States v. Johnson*, 379 F. App'x 964, 968 (11th Cir. 2010) (finding no coercion where the defendant's statements occurred at least 30 minutes after police battered down the defendant's door and placed him in handcuffs in the presence of crying children). Here, although there was an initial show of force, by the time of the interview Defendant was seated in the van and

the officers had all holstered their weapons. Although he may have been confused and concerned about his mother, there is nothing to suggest coercive conduct on the part of law enforcement.

Defendant argues that Agent Busby possibly told him that he needed to talk and tell the truth. (Doc. 701 at 14). On cross-examination, counsel asked: "Did you say to Mr. Flores, you should talk to us and you should tell us the truth?" (Doc. 672 at 77). The agent answered, "possibly." *Id.* The Court followed up and asked the agent to recount as much as she could remember about that portion of the discussion. She said, "From what I recall, we were showing him photographs. And the photographs, the male in the photograph appeared to be him. And I was informed by the case agent that it was him. And he was saying that he did not recognize the person. . . . [And I told him t]hat he should be honest with us and tell us the truth." *Id.* at 86–87.

The agent's admonition encouraging Defendant to tell the truth did not render his statements involuntary. As the Eleventh Circuit has explained, "a mere admonition to the accused to tell the truth does not render a [statement] involuntary," *United States v. Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983), nor does "a general statement that cooperation may be beneficial to an accused, with no promise of leniency," *United States v. Hipp*, 644 F. App'x 943, 947 (11th Cir. 2016);

*see also United States v. Guerrero-Moya*, No. 1:20-CR-196-LMM-JSA, 2022 WL 1499338, at *7 (N.D. Ga. May 12, 2022) (collecting cases supporting the proposition that the officers had made "the kind of generalized statements about the benefits of cooperation that the Eleventh Circuit routinely holds do not undercut voluntariness"). Defendant's statements were voluntary.

### B. Defendant Consented to the Search of his Home

The Court makes similar findings with regard to Defendant's argument that he did not consent to the search of his home and that, even if he did, the consent was not voluntary. (Doc. 701 at 15–19). Officer Busby testified that while she was sitting in the van with Defendant, and about five to ten minutes after the interview started, one of the deputy marshals asked her to ask Defendant if he would consent to a search of the home. (Doc. 672 at 54–55, 79). She asked Defendant if he had any bombs or firearms in the house, he said no, she then asked if agents could search it, and he said yes (although she does not recall the exact wording of his response). *Id.* at 54–55, 80. She did not threaten him or offer any benefit in exchange for consent (or tell him that he was not required to consent to the search), and she communicated his consent to one of the deputy marshals. *Id.* at 55, 79. Officer Cadena does not remember the specific details of the back-and-forth between Busby and Defendant about whether agents could search the house, but he

22

remembers generally that the two of them discussed the topic and that Defendant consented. (Doc. 676 at 21–23, 29–30). Defendant testified that Agent Busby never asked for consent to search his home, and he never gave such consent. *Id.* at 15.

For reasons similar to those related to the *Miranda* discussion, the Court credits the testimony of Agent Busby that she asked Defendant for consent to search the house and that he provided such consent. Although Officer Cadena does not provide as much corroborating detail as he did for the *Miranda* portion of the conversation, his testimony is generally consistent with Agent Busby's as to the fact that Busby and Defendant discussed consenting to the search of the house and that Defendant provided such consent. Even if only at a high level, his testimony corroborates that of Agent Busby and stands in sharp contrast to that of the Defendant, who testified that the conversation about consent never occurred at all.

Defendant argues that the officers' accounts contradict one another in that Busby said the discussion about the house came before the discussion about the phone, while Cadena said that the discussion about the house came after the discussion about the phone. (Doc. 701 at 16). Even if their accounts differ as to timing, and I am not entirely convinced that they do (at most, Cadena indicated that the house and phone discussion occurred around the same time, (Doc. 676 at

23

29)), I do not find this alleged inconsistency material. As noted above, Cadena's testimony on this issue is important because it generally corroborates Busby's testimony that she and Defendant discussed the consent to search. For these reasons, I credit Busby's testimony and find that Defendant consented to the search of his home.

Defendant makes a timing argument as well—that the Government has failed to prove that the agents seized the phone after Defendant consented to the search of the home. (Doc. 701 at 16–17). Defendant relies on alleged inconsistencies between the testimony of Agents Busby and Cadena regarding whether the Government had already seized the phone (presumably during the initial protective sweep) at the time they obtained consent to search the house. *Id.* Defendant maintains that the agents had no basis for seizing the phone during the protective sweep and that, if they did so, the seizure was not lawful.

Agent Busby's testimony supports the notion that the phone was not seized during the initial sweep. As an initial matter, she testified that she was not aware of agents seizing *any* evidence during the protective sweep. (Doc. 672 at 50). And as to the phone specifically, she testified that after she obtained Defendant's consent to search, she notified her colleagues that he had consented. *Id.* 55. In response to a question about whether "any marshal or agent ever inform[ed her]

of any fruits of the search of the house," Agent Busby said that "one of the DEA agents walked up to me and he handed me a cell phone that was found in one of the bedrooms of the residence on the nightstand." *Id.* at 56. Her testimony makes clear that she is not aware of any evidence being seized during the protective sweep, that she informed her colleagues after Defendant consented to the search of the house, and that one of the agents later came back to her with a phone that was recovered from inside the house. *See also id.* at 81 (noting that the agent brought her the phone "toward the end of the interview"). Her testimony supports the notion that the phone was seized pursuant to Defendant's consent to search the house.

Officer Cadena's testimony on this particular issue is not terribly illuminating. He remembers generally that there was a discussion about a phone, but he does not remember the details of that portion of the conversation or when exactly it occurred. (Doc. 676 at 30–32). So, it corroborates Agent Busby's recitation of events at a high level (that there was a discussion of a phone—in contrast to Defendant, who says that conversation never occurred at all), but not at a granular level. All in all, for the reasons described above, I find Agent Busby's testimony

credible and credit her statements that the phone was seized after Defendant

provided consent to search the house.[8]

Finally, with respect to the consent search of the home, Defendant argues

that if he consented, it was not voluntary. (Doc. 701 at 17–19).

> Voluntary consent means that the consent to search is essentially the
> free and unconstrained choice of the occupant. But beyond that, there
> is no neat talismanic definition of voluntary consent. We look to the
> specific facts of the case to decide if a person's consent to search was
> voluntary. And like most Fourth Amendment questions, that inquiry
> is based on the totality of the circumstances. In deciding the
> voluntariness issue, the factors we consider include the voluntariness
> of the defendant's custodial status, the presence of coercive police
> procedure, the extent and level of the defendant's cooperation with
> police, the defendant's awareness of his right to refuse to consent to
> the search, the defendant's education and intelligence, and,
> significantly, the defendant's belief that no incriminating evidence
> will be found.

*United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (internal quotation

marks, alterations, and citations omitted). Some of the factors weigh in

Defendant's favor—he was in custody at the time of the consent, and there is no

evidence that Agent Busby informed him of his right to refuse to consent to the

search. (*See* Doc. 672 at 79–80). Others simply do not inform the analysis in this

---

[8] As such, I decline to address the Government's alternative argument that
the agents could have lawfully seized the phone during the protective sweep.
(Doc. 716 at 15–16).

particular case, where there is no evidence regarding Defendant's level of education[9] or about whether he believed incriminating evidence would be found. And other factors weigh in the Government's favor. There is nothing to suggest any coercive police procedure, and the evidence about Defendant's cooperation suggests that he was calmly answering the agent's questions (although, as Defendant points out, there is no evidence that Defendant had any pre-existing cooperation or interaction with the police). (Doc. 672 at 53–54). Although Defendant again points out that agents entered the house with guns drawn and that he was handcuffed, (Doc. 701 at 17–18), the Court does not find that those facts (for the same reasons they did not make his *Miranda* waiver involuntary) suggest that his consent was the product of police coercion. All told, although Defendant was in custody and was not informed that he could refuse consent, the evidence shows no evidence of any coercion or suggestion that Defendant's consent was not the product of his voluntary choice. Defendant was calm, the agents did not threaten him or promise him anything, their weapons were

---

[9] Defendant cites to the "pre-trial report" for the proposition that he completed the eleventh grade. (Doc. 701 at 19). However, that report is not in evidence, nor is it attached as an exhibit. Nevertheless, even if that fact was established by competent evidence, it would not move the needle significantly in either direction.

holstered, he answered their questions, and he never complained of injury, hunger, or thirst. Under similar and, indeed, more coercive facts, the Eleventh Circuit has found voluntary consent, and the Court therefore finds that Defendant's consent to search his house was voluntary. *See, e.g., Morales*, 893 F.3d at 1368 (finding voluntary consent where, among other things, there were no threats or intimidation, the officers did not draw their weapons during the interview, the defendant was calm, the agents did not yell, and the defendant was not handcuffed); *United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983) (finding consent to search voluntary where three of the officers had reholstered their weapons, one stood apart with his weapon pointed down, defendant was not handcuffed but lying on the ground, the officers asked for consent in a conversational tone, and the officers had not threatened the defendant); *see also United States v. Chemaly*, 741 F.2d 1346, 1353 (11th Cir. 1984) (noting that an agent is not required to tell a defendant that he has the right to refuse consent and that such knowledge, or lack thereof, is simply one factor in determining voluntariness).

## C.    Defendant Consented to the Search of his Phone

Defendant argues that he was not *asked* to consent to a search of his phone and was not *asked* to provide the phone password—instead, he testified that an

28

agent demanded the password. (Doc. 701 at 19–20; Doc. 676 at 16). Agent Busby testified that after an agent handed her the phone, she asked Defendant if it belonged to him, and he said that it did. (Doc. 672 at 56). The agent then asked Defendant for consent to search the phone, and she testified that "he gave us consent and he provided the passcode for the cell phone." *Id.* As noted above, Officer Cadena's testimony on this topic is not terribly helpful—he generally remembers discussion of the phone, but he does not remember the details. (Doc. 676 at 27–32).

For the reasons stated above, I find Agent Busby's testimony credible. Therefore, I find that Defendant consented to the search of his phone and provided agents with the password for the phone.[10] Defendant's motion to suppress evidence from the search of his home, (Docs. 600, 701), should be **DENIED**.

## IV.   Defendant's Motion to Suppress Evidence Seized from his Phone

Defendant's phone was seized at the time of his arrest, and eight days later the Government obtained a warrant to search the phone signed by a United States Magistrate Judge. (Doc. 716-1). Defendant argues that the warrant lacks probable

---

[10]  The Court further notes that Agent Busby testified that she was not aware of anyone searching the phone pursuant to Defendant's consent. (Doc. 672 at 58). And as noted below, the Government later obtained a search warrant for the phone.

cause and that the information in the affidavit supporting the warrant was stale. (Doc. 704 at 5–10).

The probable cause for the warrant comes from an affidavit submitted by DEA Special Agent Bryan Tice. (Doc. 716-1). Agent Tice notes that, based on his training and experience, drug traffickers commonly use cell phones to coordinate the purchase, sale, and distribution of narcotics; maintain addresses or telephone numbers of criminal associates in their phones; use multiple phones; and pose for pictures with narcotics and firearms. *Id.* at 3–5. The agent states that DEA began investigating an Atlanta drug-trafficking organization (DTO) in March of 2019. *Id.* at 6. The affidavit identifies two narcotics brokers (Sanchez and Ramirez), two couriers (Defendant and Rojas), and several other participants. *Id.* at 6–7. The DTO was led by Sanchez, who facilitated its operation from inside a Georgia prison using a contraband cell phone. *Id.* at 7. It is clear from the affidavit that Sanchez and the other DTO members relied heavily on cell phones to coordinate their drug activities. *Id.* at 7–8.

The affidavit describes four suspected drug-related activities in which Defendant is alleged to have participated. First, on May 1, 2019, agents intercepted phone communications suggesting that methamphetamine would be delivered to a known drug stash location. *Id.* at 8. Thirty minutes later, agents saw Defendant

arrive at the location driving a black Chevrolet Avalanche. *Id.* Vazquez exited the location, met Defendant by the Avalanche, and together they unloaded and then rolled a fully inflated tire towards the stash location. *Id.* About fifteen minutes later, Defendant left. *Id.*

Second, on May 4, 2019, Defendant drove a black Chevrolet Avalanche to the same stash location described above. *Id.* Vazquez met him at the vehicle, Defendant removed a large, seemingly heavy duffel bag from the bed of the truck, and Defendant walked it towards the direction of the stash location while Vazquez followed. *Id.* at 8–9.

Third, on May 14, 2019, agents intercepted calls in which Sanchez discussed a delivery of 10 kilograms of methamphetamine scheduled for later that day. *Id.* at 9. Agents then observed Rojas arrive at a known stash location driving a vehicle registered to Defendant. *Id.* A person believed to be Defendant arrived at the same stash location driving a black Chevrolet Avalanche, also registered to Defendant. *Id.* Rojas met with co-defendant Garcia. *Id.* Garcia then got into the rear of Defendant's Avalanche and removed a large cardboard box. *Id.* Defendant and Rojas each left in their respective vehicles, and approximately an hour later, wire intercepts confirmed that 8.8 kilograms of methamphetamine had been delivered to the stash house. *Id.*

31

Fourth, on May 28, 2019, agents intercepted calls where Sanchez received information that Chivo (believed to be Rojas's nickname) would be delivering 23 units. *Id.* at 10. An hour later, agents saw a black Avalanche and a silver Toyota arrive at a known stash location—the Avalanche stopped, and the Toyota drove on. *Id.* Garcia met Defendant at the Avalanche and retrieved a large duffle bag from the truck. *Id.* Garcia dragged the bag into the stash apartment, with Defendant following closely behind. *Id.* Shortly thereafter, Defendant left the apartment and drove from the area, with Rojas following behind him in the Toyota. *Id.* Defendant and Rojas then met at a nearby gas station. *Id.* About thirty minutes after Defendant left the apartment, wire intercepts confirmed that 21 kilograms of drugs had been delivered to the stash house. *Id.*

Defendant argues that there was no probable cause to search his phone because, although the affidavit details phone calls made by others in the DTO, he was not intercepted on any of those calls and there is no other information to suggest that *he* used a phone. (Doc. 704 at 6–7). A magistrate judge reviewing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a

32

particular place." *United States v. Jiminez*, 224 F.3d 1243, 1248 (11th Cir. 2000) (internal quotation marks omitted). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Gill ex rel. K.C.R. v. Judd*, 941 F.3d 504, 516 (11th Cir. 2019) (internal quotation marks omitted). "It requires more than mere suspicion, but does not require convincing proof." *Id.* at 516–17 (internal quotation marks omitted). As the Eleventh Circuit has explained, the "mere probability or substantial chance of criminal activity is all that is needed . . . [and n]othing even approaching conclusive proof or proof beyond a reasonable doubt is required." *United States v. Delgado*, 981 F.3d 889, 897 (11th Cir. 2020) (internal quotation marks omitted). "All in all, it's not a high bar." *Gill*, 941 F.3d at 517 (internal quotation marks omitted).

And in reviewing the federal search warrant that was issued in this case, the undersigned need only determine that the magistrate judge had a *substantial basis* for concluding that probable cause existed. *United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013); *United States v. Maxson*, No. 1:18-CR-404, 2020 WL 703137, at *2 (N.D. Ga. Feb. 12, 2020) ("The duty of a reviewing court is simply to ensure that the magistrate judge had a substantial basis for concluding that probable cause existed." (internal quotation marks and alteration omitted)).

The affidavit offered in support of the warrant offers ample probable cause — let alone a substantial basis for concluding that probable cause existed — to search Defendant's phone for evidence of narcotics trafficking. The facts the agent set forth make clear that members of the DTO relied extensively on phones to manage their illegal activities. And the affidavit shows how phones were used in specific drug deliveries that Defendant participated in. Indeed, for three of the four deliveries, agents intercepted phone calls prior to the delivery in which members of the DTO were talking about what was about to occur. (Doc. 716-1 at 8–10). And for two of them, there were phone calls after the delivery confirming what had happened. *Id.* The fact that phones were used to arrange and confirm drug deliveries that Defendant directly participated in provides more than a probability or substantial chance that evidence about the illegal activity would be found on Defendant's phone. To require the Government to provide evidence of each particular participant's use of a phone, in the context of a DTO where there is copious evidence at the macro and micro levels regarding the organization's extensive phone use, would elevate the burden well beyond that of probable cause. And that is doubly so here, where the question is only whether there is a substantial basis to conclude that probable cause existed. And finally, as the Government correctly points out, the search warrant sought location information

34

that would have existed on Defendant's phone regardless of whether he used it to communicate about the drug transactions that he participated in. (Doc. 716 at 18). For these reasons, I find that the magistrate judge had a substantial basis for concluding that probable cause existed.

Defendant makes a related argument that there is no evidence that the phone seized in 2020 was the same phone Defendant was using in 2019, when the illegal activities are alleged to have occurred. (Doc. 704 at 9-10). Again, Defendant seeks to impose a burden higher than probable cause. Here there is probable cause to find that the Sanchez DTO used phones to coordinate drug activities, there is probable cause to find that Defendant participated in those activities, and when Defendant was arrested approximately a year after the alleged conduct, he possessed a phone. Under those facts, the Government need not *prove* that the phone Defendant had at the time of his arrest is the same one he had 15 months earlier—we are dealing only in probabilities, and under these facts, there is at least a substantial basis for concluding that Defendant's seized phone would contain evidence of the drug trafficking that Defendant engaged in 15 months prior.

Defendant argues that the information about his alleged drug activity (all of which occurred in May of 2019) was stale by the time the agents sought a warrant for the phone in August of 2020. (Doc. 704 at 8–9). The staleness doctrine "requires

that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). "There is no particular rule or time limit for when information becomes stale." *Id.* at 1265. Rather, "staleness is an issue that courts must decide by evaluating the facts of a particular case." *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985). In doing so, courts consider "the length of time as well as the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *United States v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018) (internal quotation marks omitted).

Here, the information relates not to an isolated act, but to a drug conspiracy involving multiple members stretching over a period from at least March through July of 2019. (Doc. 716-1 at 6-12). In cases involving "protracted or continuous conduct, time is of less significance." *Bervaldi*, 226 F.3d at 1265; *United States v. Middleton*, ---F. Supp. 3d.---, 2022 WL 951336, at *7 (N.D. Ga. Mar. 30, 2022) (considering the fact that the case involved "an ongoing conspiracy with many participants"). In this case, however, even more important than the nature of the crime (which weighs in favor of finding that the information was not stale) is the type of information sought. The Government sought electronic information from

36

a phone, which can remain on the device for long periods of time, even after the user has attempted to delete it. (Doc. 716-1 at 13–14 (noting that "electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the [i]nternet")); *Touset*, 890 F.3d at 1238 (noting that "probable cause of involvement in *electronic* child pornography remains even longer because deleted files can remain on electronic devices" (emphasis in original)); *Middleton*, 2022 WL 951336 at *7 ("Further, the cell phone and the information derived therefrom is digital media, and courts have generally found that longer periods of time do not render this kind of information stale"); *United States v. Soviravong*, No. 1:19-CR-146-AT-CMS, 2019 WL 7906186, at *5 (N.D. Ga. Dec. 2, 2019) (finding that information in a search warrant affidavit was not stale more than two years after particular emails were sent because "there existed more than a fair probability that evidence of illegal conduct still remained" on the email servers), *adopted by* 2020 WL 709284 (N.D. Ga. Feb. 12, 2020). Particularly in light of the fact that electronic data could be recovered from the phone months or years after it was originally created, the 15 months at issue here does not render the information stale.[11]

---

[11] Defendant acknowledges that phones can store information for some time but argues that the Eleventh Circuit in *Touset* "distinguished drugs from

The Government argues that even if the warrant was not supported by probable cause, the good-faith exception applies. (Doc. 716 at 21–23). In *United States v. Leon*, the Supreme Court held that the exclusionary rule should not bar the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." 468 U.S. 897, 900, 922 (1984). The good-faith exception should *not* apply in these circumstances:

> (1) where the magistrate judge was misled by information in a warrant application that the applicant knew was false or would have known was false but for a reckless disregard of the truth; (2) where the magistrate "wholly abandoned" her judicial role; (3) where the affidavit supporting the warrant application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) where the warrant was "so facially

---

other forms of electronic materials, like child pornography." (Doc. 704 at 9). In *Touset*, the Eleventh Circuit quoted a Tenth Circuit case for the proposition that "'information that a person received electronic images of child pornography is less likely than information about drugs, for example, to go stale because the electronic images are not subject to spoilage or consumption.'" *Touset*, 890 F.3d at 1238 (quoting *United States v. Burkhart*, 602 F.3d 1202, 1206–07 (10th Cir. 2010)). The distinction the court identified in *Touset* is not between electronic drug information and electronic information of other crimes (like child pornography), but rather between electronic information and non-electronic information. Here, the information about drugs the warrant sought is electronic data that agents could seize months or years later from a phone, as opposed to other types of "information about drugs" that might be subject to a more traditional staleness analysis (for example, an anonymous tip that drug activity is occurring at a particular location).

deficient" that officers couldn't have reasonably presumed it to be valid.

*United States v. Taylor*, 935 F.3d 1279, 1291 (11th Cir. 2019) (quoting *Leon*, 468 U.S. at 923). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990).

There is no suggestion that the information in the affidavit was false, that the magistrate judge wholly abandoned his role, or that the warrant was so facially deficient that others would have known not to rely on it. Instead, Defendant simply argues that, for the same reasons noted above, the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable. (Doc. 728 at 10). Under the "so lacking in indicia" inquiry, the focus is on whether the officer or agent acted in objective good faith, and not on whether the information was sufficient to create debate or disagreement among reasonable jurists. *Taxacher*, 902 F.2d at 871–72. Here the DEA agent consulted with an Assistant United States Attorney and then submitted the matter to a neutral United States Magistrate Judge, which are "steps . . . indicative of objective good faith." *Id.* at 872. And the probable cause (which, as noted above, I think is more

than sufficient) is not so weak as to render official belief in its existence entirely unreasonable. Defendant's motion to suppress information received from the phone, (Docs. 602, 704), based on the alleged illegality of the search warrant, should be **DENIED**.

## V.     Defendant's Motion to Suppress Evidence Seized from a Tracker Warrant

Defendant moves to suppress evidence seized from a vehicle tracker warrant, arguing that the affidavit fails to establish probable cause. (Doc. 703). For the reasons set forth below, this motion should be denied.

On June 13, 2019, Special Agent Tice submitted an affidavit in support of a request for a federal tracker warrant for a 2004 Chevrolet Avalanche registered to Defendant. (Doc. 716-2). The affidavit recounts that agents intercepted communications, over a phone used by Sanchez, indicating that a drug courier would arrive at the Paramont Apartments on May 13, 2019. *Id.* at 8. Agents conducted surveillance at the apartments, saw two cars arrive, and observed defendant Garcia-Lara (a/k/a Gordo) exit Apartment J carrying a plastic bag. *Id.* Garcia-Lara met with one of the drivers and then returned to Apartment J. *Id.* The driver he met with then got out of the car and placed a plastic bag in the trunk of the second car. *Id.* Deputies performed a traffic stop on the second car, from which

40

they recovered two kilograms of methamphetamine in the same plastic bag that agents previously saw the other driver place into the trunk. *Id.* at 9.

The next day, agents intercepted a number of communications involving Sanchez indicating that a drug courier (believed to be Chivo) would be delivering drugs that day. *Id.* at 9–13. Sanchez and others discussed the quantity of drugs that would be delivered and how much money the courier should be paid. *Id.* That evening, agents observed Garcia-Lara walk out of Apartment J and meet with someone believed to be Chivo, who arrived in a 2011 Dodge Durango. *Id.* at 12. Garcia-Lara then walked back inside Apartment J. *Id.* Shortly thereafter, a 2004 Chevrolet Avalanche (the car that is the subject of the tracker warrant) arrived, driven by a driver the agents could not identify. *Id.*

Agents observed what they believed to be a drug deal occur inside the Avalanche. *Id.* Chivo then left in the Durango, in tandem with the Avalanche. *Id.* Both the Durango and the Avalanche are registered to Defendant. *Id.* About an hour after the suspected drug transaction, agents intercepted a call between Sanchez and another conspirator in which she informed him that the "rice" they bought was short "1 plate plus 160 stripes"—which Special Agent Tice interpreted to mean that delivery of drugs occurred and was short 1,160 grams. *Id.* at 13. The agents observed the Avalanche in the Northern District of Georgia on both May

30 and June 4, 2019, and the magistrate judge signed the tracker warrant for the Avalanche on June 13, 2019. *Id.* at 1, 13.

Defendant argues that there was no probable cause to support the warrant. (Doc. 703 at 4–5). He maintains that the fact that the vehicle was involved in a "single isolated drug transaction" cannot support the inference that it would be involved in further transactions, particularly given that the warrant was signed a month after the drug deal. *Id.* at 4.

Again, as for the warrant discussed above, the question is only whether there is a "fair probability" that contraband or evidence of a crime would be found by installing a tracking device. *Jiminez*, 224 F.3d at 1248. Defendant suggests that evidence that the vehicle was involved in one drug transaction does not give rise to a fair probability that it would be involved in another, but it is not clear why that is so. Again, we are dealing only with probabilities, and here there is ample evidence to suggest that the Avalanche was involved in a drug delivery. Agents intercepted communications suggesting that a drug transaction would occur on May 13, they observed the suspected transaction, and they then stopped one of the cars that was involved and recovered drugs. (Doc. 716-2 at 8–9). The next day, there were additional communications suggesting that another deal would take place, the agents observed the same location, they saw a common participant from

the day before (Garcia-Lara was involved in both), they saw a suspected deal take place in the Avalanche, and they intercepted communications less than an hour later confirming the delivery. *Id.* at 9–13. With that level of evidence, it is not at all clear why agents would have to observe another transaction or develop more information tying the Avalanche to drug activity—they saw it used to broker a drug transaction, which provides at least a fair probability that it would be used in a similar fashion again.

Other judges on this court have rejected an identical argument that another defendant made in another case. In *United States v. Boyzo-Mondragon*, the court noted that common sense suggests that "brokers of drug transactions rarely facilitate sales on a one-time basis" and found probable cause to support a tracker warrant for a vehicle that had been involved in one methamphetamine transaction. No. 1:19-CR-115-TWT-LTW, 2021 WL 1381155, at *6 (N.D. Ga. Feb. 5, 2021), *adopted by* 2021 WL 1379238 (N.D. Ga. Apr. 9, 2021) (overruling the defendant's objections to the R&R, finding abundant probable cause to support the issuance of the tracker warrant, and rejecting the argument that probable cause was lacking because the vehicle had been involved in only one transaction). And other courts have found probable cause based on much less. *See, e.g., United States v. Faulkner*, 826 F.3d 1139, 1145 (8th Cir. 2016) (affirming a finding of probable cause for a tracking warrant

43

based on information from an informant that the defendant was transporting heroin between Chicago and Minneapolis, staying at two addresses, and driving two vehicles, but where there was no evidence that the officers actually observed either vehicle involved in drug activity). Here the evidence of probable cause was strong, and the fact that a month elapsed between the transaction and when the agents sought the warrant does not fatally detract from that probable cause.[12]

The Government further argues that even if there was not probable cause, the agents relied on the warrant in good faith. (Doc. 716 at 21–23). I agree. The probable cause to support the warrant was not so weak as to render official belief in its existence entirely unreasonable. For all of these reasons, Defendant's motion to suppress information obtained from the tracker warrant, (Docs. 603, 703), should be **DENIED**.

---

[12] Defendant notes that the agents were not able to identify the driver of the Avalanche and argues that "it is entirely possible that someone else was using the subject vehicle on that day." (Doc. 703 at 4–5). All of that is true, but it does not take away from the probable cause to track the *vehicle*. The warrant was to track the Chevrolet Avalanche—not the Defendant—and there is probable cause to believe that the vehicle was involved in a drug transaction.

44

## VI.    Defendant's Motion to Suppress Information Obtained from a Pole Camera

Defendant moves to suppress information obtained from a pole camera that recorded events near 6529 Norcross Tucker Road. (Docs. 623, 702).[13] As noted above in the facts section, the camera was active for 44 days. (Doc. 672 at 90, 96). It was attached to a power pole inside of an apartment complex, *id.* at 106, 109, and it generally showed several apartment buildings and an adjoining parking lot. (*Id.* at 92–93; Gov. Exh. 1). It allowed agents to focus on a breezeway of one of the buildings, see specific cars in the parking lot, and observe people moving about outside of the buildings. (Doc. 672 at 93-95; Gov. Exhs. 2–5).

The camera did not give the agents the ability to see anything that they could not see in person—it did not have, for example, infrared or night-vision capabilities. (Doc. 672 at 98). Nor did the camera record audio. *Id.* at 98–99. It could not see into any private residences, and it allowed agents to observe only the

---

[13] Defendant originally sought to suppress information obtained from another pole camera as well, near 3544 Old Chamblee Tucker Road. (Doc. 623 at 1). However, the Government subsequently represented that it does not intend to use any footage from that camera at trial, and Defendant agreed that the portion of his motion challenging that camera is moot. (Doc. 676 at 7–8). As such, I recommend that the portion of the motion related to the camera at Chamblee Tucker Road be **DENIED AS MOOT**.

common, outside areas of the apartment complex. *Id.* at 98. However, if a resident in one of the apartments within the camera's view left the window blinds open, and light conditions were such that someone walking by that apartment could see inside, the camera would have the same view as that person. *Id.* at 128–29, 132–33. Regardless, the testifying agent was not aware of anyone ever manipulating the camera so as to see into any apartment, nor was he aware of any recorded footage that allowed them to see inside of a residence. *Id.* at 133–34. The apartment used as the drug stash-house was not visible from where the camera was positioned. *Id.* at 135. Defendant argues that any evidence obtained from the pole camera should be suppressed because the agents failed to obtain a search warrant. (Doc. 702).

The Fourth Amendment provides, in relevant part, for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a Fourth Amendment claim, a defendant must show two things:

> First, there must be a search and seizure of that individual's person, house, papers or effects, conducted by an agent of the government; stated differently, there must be an invasion of the claimant's reasonable expectation of privacy. Second, the challenged search and seizure must be "unreasonable," as not all searches and seizures are proscribed by the fourth amendment, but only those that are "unreasonable."

*United States v. Segura-Baltazar*, 448 F.3d 1281, 1285 (11th Cir. 2006) (internal

quotation marks omitted). "The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy." *Id.* at 1286. "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* (internal quotation marks omitted).

Defendant does not clearly distinguish between the subjective and objective components of his alleged expectation of privacy in his brief. Perhaps understandably, because it is difficult to imagine how Defendant could have exhibited an actual expectation of privacy in the manifestly public areas recorded by the surveillance camera—a parking lot of an apartment complex, the walkways and open space around the apartment buildings, and a breezeway into one of the buildings. *Cf. United States v. Tuggle*, 4 F.4th 505, 513 (7th Cir. 2021) (finding that the subjective component of the analysis was not satisfied, in a pole camera case, where the defendant had not "erected any fences or otherwise tried to shield his yard or driveway from public view, which might have signaled he feared the wandering eye or camera lens on the street").

Defendant's brief seems to focus on the objective component of the analysis—that the expectation of privacy be one that society recognizes as

reasonable. He focuses his argument on the state of the law following the Supreme Court's decisions in *United States v. Jones*, 565 U.S. 400 (2012) and *Carpenter v. United States*, 138 S. Ct. 2206 (2018). In *Jones*, the Court used a property-based approach to conclude that a Fourth Amendment search occurred when officers installed a GPS device on a vehicle and tracked the vehicle's movements for 28 days—the officers "physically occupied private property for the purpose of obtaining information" without first obtaining a warrant. 565 U.S. at 404.[14] And in *Carpenter*, the Court held that a Fourth Amendment search occurs when the Government "accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 138 S. Ct. at 2211. This is so because individuals have a "reasonable expectation of privacy in the whole of their physical movements." *Id.* at 2217. With the time-stamped data that the Government can obtain from a phone, it is able to track not only a suspect's particular movements, "but through them his familial, political, professional, religious, and sexual associations." *Id.* (internal quotation marks omitted). The Court was careful to limit its holding, however, describing the decision as "a

---

[14] There actually was a warrant in the case, but the Government did not comply with the requirements for installing it, and the United States argued only that the tracker did not require a warrant. 565 U.S. at 403 n.1.

48

narrow one," and expressly stating that it was not calling into question "conventional surveillance techniques and tools, such as security cameras." *Id.* at 2220.

The information the Government obtained in this case—video footage of a parking lot for an apartment, the walkways and open spaces around the apartment complex, and a breezeway leading into an apartment building—bears little if any resemblance to the information at issue in *Jones* and *Carpenter*. The Government did not trespass on any private property (as was the case in *Jones*) or comprehensively chronicle the whole of anyone's physical movements (as it did in *Carpenter*). Rather, it simply obtained video footage of decidedly public places— a parking lot, an apartment's breezeway, and the outside spaces of an apartment complex—that were in no way shielded from the public view or otherwise cloaked with some barriers or other manifestations of privacy. *See Katz v. United States*, 389 U.S. 347, 352 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."). As such, Defendant has failed to demonstrate that that he had any expectation of privacy that society would be willing to accept as reasonable in what happened in the open, public areas of an apartment complex.

49

Nor is the Court breaking new ground in so holding—this case falls squarely in line with a host of out-of-district, post-*Carpenter* cases that have found that the Government does not undertake a Fourth Amendment search through the use of a pole camera. *See, e.g., United States v. Dennis*, 41 F.4th 732, 740–41 (5th Cir. 2022) (holding, on plain error review, that pole cameras directed at the front and back of the defendant's properties did not amount to a search because "[s]urveillance of areas open to view of the public without any invasion of the property itself is not alone a violation" of the Fourth Amendment); *Tuggle*, 4 F.4th at 510–11 (finding that the use of pole cameras focused on the outside of the defendant's home, and which captured 18 months of footage, did not amount to a search and holding that "the government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings, did not run afoul of the Fourth Amendment"); *United States v. May-Shaw*, 955 F.3d 563, 568–69 (6th Cir. 2020) (finding that 23 days of camera surveillance of a parking lot near the defendant's apartment and a covered carport next to the building did not amount to a Fourth Amendment search in part because "the footage and photos only revealed what [the defendant] did in a public space—the parking lot"); *United States v. Bronner*, No. 3:19-cr-109-J-34JRK, 2020 WL 3491965, at *23 (M.D. Fla. May 18, 2020) ("The pole camera in this case captured views visible to anyone standing

50

on the sidewalk or driving on the street, and Defendant did not have a reasonable expectation of privacy in the public sidewalk or roadway."), *adopted by* 2020 WL 3490192 (M.D. Fla. June 25, 2020); *United States v. Kelly*, 385 F.Supp.3d 721, 726–27 (E.D. Wis. 2019) (distinguishing *Carpenter* and holding that the "defendant's attempt to equate a process that records only what someone standing in the apartment hallway, or outside the apartment complex, could have seen with a process [that] follows a person into homes, places of worship, hotels, bedrooms, restaurants and meetings, takes *Carpenter*'s reasoning too far").

And it is consistent with the decisions that other judges on this court have reached as well. *See United States v. Flores*, No. 1:19-CR-364-MHC-JSA, 2021 WL 1897152, at *10–11 (N.D. Ga. Feb. 5, 2021) (distinguishing *Carpenter* and recommending that a motion to suppress pole-camera footage that recorded the exterior of a residence for approximately 2.5 months, and where there was no evidence that the defendant was ever recorded, be denied), *adopted by* 2021 WL 1312583 (N.D. Ga. Apr. 8, 2021) (holding that the "images of a single, fixed location captured by the pole camera in this case do not equate with the activities revealed by cell-site location information considered by the Court in *Carpenter*"); *United States v. Fanning*, No. 1:18-CR-362-AT-CMS, 2019 WL 6462830, at *3–4 (N.D. Ga. May 28, 2019) (finding no expectation of privacy with regard to a pole camera

51

capturing surveillance of a "public area" at a warehouse), *adopted by* 2019 WL 3812423 (N.D. Ga. Aug. 13, 2019); *United States v. Gbenedio*, No. 1:17-CR-430-TWT-JSA, 2019 WL 2177943, at *2–4 (N.D. Ga. Mar. 29, 2019) (finding no expectation of privacy in footage captured by a pole camera aimed at the front of pharmacy located in a publicly accessible strip mall), *adopted by* 2019 WL 2173994 (N.D. Ga. May 17, 2019).

Defendant argues that the pole camera allowed the officers to do what they otherwise could not have done. (Doc. 702 at 8–10). For example, he notes that it allowed the agents to go back and review recorded footage (which they could not have done had they simply been observing the parking lot) and permitted them to surveil the area continuously for 44 days (which they could not reasonably have done with their available resources and without being detected). These arguments, it seems to me, miss the mark. The point is not that the agents could have obtained the exact same information through both in-person and electronic surveillance—indeed, the Court has little trouble concluding that they *could not* have learned as much through in-person observation as they did through electronic surveillance. *See Tuggle*, 4 F.4th at 526 ("We emphasize, however, that our decision in Tuggle's case does not rest on the premise that the government *could have*—in theory— obtained the same surveillance by stationing an agent atop the utility poles outside

Tuggle's home, thus rendering the decision to instead use pole cameras constitutional. . . . In our view, the premise that the government could realistically accomplish the pole camera surveillance here for more than a few days is a fiction that courts should not rely on to limit the Fourth Amendment's protections."). Rather, the point is that the information the Government obtained, from a decidedly public space, is simply outside the parameters of what the Supreme Court has held that the Fourth Amendment protects. The Seventh Circuit explained it well:

> Of course, the stationary cameras placed around Tuggle's house captured an important sliver of Tuggle's life, but they did not paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon. If the facts and concurrences of *Jones* and *Carpenter* set the benchmarks, then the surveillance in this case pales in comparison.

> In those cases, the justices expressed concerns about surveillance leading to "a precise, comprehensive record of a person's *public* movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *See Jones*, 565 U.S. at 415, 132 S. Ct. 945 (Sotomayor, J., concurring) (emphasis added); *Carpenter*, 138 S. Ct. at 2217 (same). Following this reasoning, many justices saw the GPS and CSLI technologies in *Jones* and *Carpenter* as capable of capturing the whole of the defendants' movements, therefore implicating the Fourth Amendment. The CSLI at issue in *Carpenter* even tracked the defendant's movement through not only public areas, but also private places, which the Court likened to "attach[ing] an ankle monitor to the phone's user." 138 S. Ct. at 2218.

> Unlike those technologies, the cameras here exposed no details about

53

> where Tuggle traveled, what businesses he frequented, with whom
> he interacted in public, or whose homes he visited, among many other
> intimate details of his life. If anything, far from capturing the "whole
> of his physical movements," *id.* at 2219, or his "public movements,"
> *Jones*, 565 U.S. at 415, 132 S. Ct. 945 (Sotomayor, J., concurring), the
> cameras only highlighted Tuggle's *lack* of movement, surveying only
> the time he spent at home and thus not illuminating what occurred
> when he *moved* from his home.

*Tuggle*, 4 F.4th at 524.

Defendant cites *People v. Tafoya* and *United States v. Cuevas-Sanchez*, (Doc. 702 at 6–8), but both involve facts very different from those in this case. In *Tafoya*, the police used a pole camera to continually record images of a suspect's home for a period of three months, including portions of the backyard, a garage, and part of a driveway that were enclosed behind a six-foot-high privacy wall. 494 P.3d 613, 615 (Colo. 2021). The court noted that a person standing on the street could not see into the backyard, and it held that the defendant had a subjective expectation of privacy that society was prepared to recognize as reasonable. *Id.* at 622–23. In *Cuevas-Sanchez*, the agents placed a pole camera to record several months of footage of the defendant's backyard, which was enclosed by fences (some as high as 10 feet) on all sides. 821 F.2d 248, 250 & n.1 (5th Cir. 1987). The court held that, in light of the fences, the defendant had a subjective expectation of privacy in the backyard area of the property and that the expectation was one that society was

willing to recognize as reasonable. *Id.* at 250–51. Here, in contrast, Defendant took no efforts to shield the areas captured by the pole camera from view. He did not enclose the parking lot or the walkways around the apartment buildings within a fence or otherwise keep the public from seeing those areas. Indeed, he could not have done so, precisely because of the public nature of the areas that were surveilled. For all the reasons stated above, Defendant had neither a subjective nor objectively reasonable expectation of privacy in the areas that were captured by the pole camera, and his motion to suppress, (Docs. 623, 702), should be **DENIED**.[15]

## VII.   Defendant's Motion for a Bill of Particulars

Defendant is charged with conspiring with 14 other people identified in the indictment, as well as others known and unknown to the grand jury, to knowingly

---

[15] In *United States v. Moore-Bush*, the *en banc* First Circuit evenly split on whether a Fourth Amendment search occurred when officers used a pole camera to record eight months of footage of the front structure of a residence, including "its side entrance and a gardening plot near that entrance, the whole of the home's private driveway, the front of the home's garage, much of the home's front lawn, and the vast majority of the walkway leading from the home's private driveway up to the home's front door (although not the front door itself)." 36 F.4th 320, 323 (1st Cir. 2022) (*en banc*) (Barron, C.J., concurring). Even putting aside the fact that a majority of that court could not agree on whether there was a search for purposes of the Fourth Amendment, the facts are materially different—44 days of footage of the public areas of an apartment complex in this case, as opposed to eight months of the curtilage of a home in that one.

and intentionally possess with the intent to distribute at least 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. (Doc. 231, Count One). The indictment alleges that the conspiracy began by at least April of 2019 and continued until at least September 10, 2019. *Id.* He is also charged with aiding and abetting co-defendants Sanchez-Morales, Rojas, Garcia-Lara, and Stephens, and Erin Bella Cortez, along with others known and unknown to the grand jury, to knowingly and intentionally possess with the intent to distribute at least 500 grams of a mixture and substance containing a detectable amount of methamphetamine, on or about May 29, 2019, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2. (Doc. 231, Count Four).

Defendant seeks this additional information through a bill of particulars:

- His alleged role as a drug supplier, distributer, and/or courier for the indicted, named, and unnamed co-conspirators;

- His alleged agreement or connection to any defendant as part of the conspiracy, including the dates and times in which he is alleged to have formed an agreement and/or acted in furtherance of the conspiracy;

- The manner and means by which he aided and abetted Sanchez-

Morales, Rojas, Garcia-Lara, and/or Stephens, in committing the acts

charged in Count Four;

- His role on any other day or in any other aspect of the conspiracy from

  April of 2019 through September of 2019; and

- The names of all unindicted co-conspirators.

(Doc. 599 at 3–4). In short, Defendant seeks a detailed list of everything he is

alleged to have done in furtherance of the conspiracy, the names of everyone

involved, and particulars for how he is alleged to have engaged in the substantive

crime charged in Count Four. *Id.* The Government argues that Defendant's

requests extend beyond what is appropriate for a bill of particulars and that the

discovery adequately informs Defendant of his conduct. (Doc. 716 at 29).

Specifically, the Government maintains that the discovery details "all defendants'

roles in the conspiracies; the identities of known unindicted co-conspirators; and

the methods used to transport and distribute the drugs." *Id.* at 29–30. Defendant

did not file a reply brief as to this motion.

"The purpose of a bill of particulars is to inform the defendant of the charge

against him with sufficient precision to allow him to prepare his defense, to

minimize surprise at trial, and to enable him to plead double jeopardy in the event

of a later prosecution for the same offense." *United States v. Davis*, 854 F.3d 1276,

57

1293 (11th Cir. 2017) (internal quotation marks omitted). "A bill of particulars may not be used to obtain a detailed disclosure of the government's evidence prior to trial," nor is a defendant entitled to one "where the information sought has already been provided by other sources, such as the indictment and discovery." *Id.* (internal quotation marks omitted). A bill of particulars "is not a general tool of discovery, nor is it a device to give the defense a road map to the government's case." *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD, 2007 WL 1706351, at *14 (N.D. Ga. June 12, 2007). Instead, a bill of particulars "supplements an indictment by providing the defendant with information *necessary* for trial preparation." *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) (emphasis in original). It is appropriate where the indictment "fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). "Courts have routinely denied requests for bills of particulars concerning the 'wheres, whens and with whoms' of the crime." *United States v. Bonventre*, No. 10 Cr. 228(LTS), 2013 WL 2303726, at *6 (S.D.N.Y. May 28, 2013), *aff'd*, 646 F. App'x 73, 78–79 (2d Cir. 2016). Furthermore, "[a] bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy," nor "is the government required to provide defendants with all

58

overt acts that might be proven at trial." *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986).

Defendant seeks information that he either already has through discovery or is simply not entitled to obtain through a bill of particulars. His request for all of the acts he undertook, as well as details about the formation and existence of the conspiracy, exceeds the scope of what a bill of particulars is designed to provide. *See id.*; *United States v. Addaquay*, No. 1:20-CR-45-LMM-JSA, 2020 WL 6600021, at *3 (N.D. Ga. July 13, 2020) (denying a request for a bill of particulars for "all relevant actions of all conspirators" and "all specific acts or transactions that [the defendants] are alleged to have committed in furtherance of and during the course of the conspiracy"), *overruling objections to magistrate judge's order*, 2020 WL 4530001 (N.D. Ga. Aug. 6, 2020). And the Government states that it has provided in discovery the identities of the known unindicted co-conspirators. (Doc. 716 at 29–30).

Defendant seeks information for how he aided and abetted Sanchez-Morales, Rojas, Garcia-Lara, and Stephens (the other defendants named in Count Four, which charges a substantive crime alleged to have occurred on May 29, 2019). But the Government details specific facts related to that transaction, including the roles of Defendant and each of the other co-defendants identified in

that count, which it maintains that it provided in discovery. (Doc. 716 at 7–9).

Indeed, many of those facts are recounted in detail in the portion of this R&R

addressing Defendant's motion challenging the search warrant for his phone.

(Doc. 716-1). [16] Indeed, the Government's recitation of facts related to the

transaction that occurred on May 28, 2019 includes references to specific

conversations among the charged defendants, agent observations from

surveillance, and intercepted wire communications—all of which the Government

says is within the discovery. (Doc. 716 at 9, 29).

All told, the superseding indictment identifies the charged statutes, the

dates on which the crimes occurred, and the controlled substances at issue.

Between the indictment and the discovery, the Government has identified the

names of the known co-conspirators, specific transactions Defendant was involved

with, and details regarding the substantive crime charged in Count Four. Nothing

more is required. *See Leiva-Portillo*, 2007 WL 1706351, at * 15 (denying a request for

a bill of particulars in similar circumstances). Nor has Defendant explained why

---

[16] The Court notes that the Indictment charges the substantive crime that occurred on or about May 29, 2019, (Doc. 231 at 10), while the information in the Government's brief and the affidavit in support of the phone search warrant details a drug transaction Defendant participated in on May 28, 2019. (Doc. 716 at 9; Doc. 716-1 at 10).

he *needs* more information to properly prepare for trial, minimize surprise, or assert double jeopardy in the future. The motion for a bill of particulars, (Doc. 599), is therefore **DENIED**.

## III.   Conclusion

For the reasons stated above, I recommend that Defendant's motion to suppress evidence seized from his residence, (Docs. 600, 701), his motion to suppress information seized from his phone, (Docs. 602, 704), and his motion to suppress information seized from the vehicle tracking device, (Docs. 603, 703), be **DENIED**.

Defendant's motion to suppress information seized from a pole camera, (Docs. 623, 702), should be **DENIED IN PART** and **DENIED AS MOOT IN PART**.

Defendant's motion for a bill of particulars, (Doc. 599), is **DENIED**.

There are no other motions pending, and this matter is now **READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED,** this 17th day of November, 2022.

_____

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE